(No. 52843.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOHN McTUSH, Appellee.

*Opinion filed September 15, 1980.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackay and Melbourne A. Noel, Jr., Assistant Attorneys General, of Chicago, and Marcia B. Orr and Paul C. Gridelli, Assistant State's Attorneys, of counsel), for the People.

Ralph Ruebner, Deputy Defender, of the Office of State Appellate Defender, of Chicago (Gary Ravitz, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

The defendant, John McTush, was convicted of murder and armed robbery and burglary on October 19, 1977, by a jury in the circuit court of Cook County. Lonzell Stone, a codefendant, was tried without a jury contemporaneously and was also found guilty "in manner and form as charged in the indictment." After a hearing in aggravation and mitigation, McTush was sentenced to a term of 60 to 90 years' imprisonment and Stone was sentenced to a term of 25 to 50 years. On appeal to the appellate court (78 Ill. App. 3d 603), the convictions of McTush were vacated and the cause remanded for an evidentiary hearing regarding the existence of an independent origin for a witness' in-court identification of McTush. Stone's conviction for armed robbery was reversed, his remaining convictions were affirmed, his sentence was vacated, and the cause was remanded for resentencing. The State appealed from the appellate court's judgment. We granted its petition for leave to appeal. (73 Ill. 2d R. 315(a).) Only the validity of McTush's convictions is involved in this appeal.

On February 20, 1976, two men were observed entering the Kar-Life Battery Station at 6959 South Ashland Avenue in Chicago. According to the testimony of Terrence Watson, who was 11 years old at the time of the occurrence, he saw David Thomas, an employee of the battery shop, strike McTush in the mouth. McTush then shot Thomas four or five times and removed what was circumstantially proved at trial to be the shop's cash receipts from Thomas' jacket pocket. Terrence further testified that the other man, later identified as Lonzell

Stone, went to the rear of the shop, out of his line of sight. Moments later Terrence heard more gunshots. Police officers who later searched the shop found the body of Dennis Harrison in the rear of the shop. He had been shot two times. As the men turned to come out of the shop toward their car, they looked directly at Terrence. Terrence then ran east on 70th Street toward Justine Avenue in a direction away from his home. After the men drove away, Terrence went home. Terrence later testified at trial that he saw the two men drive away in a black and brown Oldsmobile Delta 88 with a dent in the right fender. Terrence's mother, Mrs. Ira May Watson, looking from her kitchen window on the second floor of an apartment building adjacent to the battery shop, observed two men leave the shop and noticed that one of the men "strongly resembled" McTush.

On March 18, 1976, Terrence and his mother viewed a lineup, consisting of five black males of approximately equal height. One of the members of the lineup was McTush. Stone was not in the lineup. Neither Terrence Watson nor his mother identified any of the members of the lineup as a perpetrator of the offenses at the battery shop.

Subsequently, on May 24, 1976, shortly before testifying before the grand jury, Terrence and his mother were interviewed by an assistant State's Attorney. While his mother waited in another room, Terrence was shown a photograph of a separate lineup conducted on February 21, 1976. Terrence identified Stone from the photograph. McTush had not participated in that lineup. Terrence was then shown six photographs of various persons. Upon viewing the six photographs, Terrence indicated McTush as the man who had been with Stone on February 20, 1976. He also said that he had observed this same man in the lineup conducted on March 18, 1976. Mrs. Watson was unable to make a positive identification but she stated that

McTush "strongly resembled" the man in the gray coat she witnessed leaving the battery shop.

At a hearing on a motion to suppress Terrence's out-of-court identifications of Stone and McTush, the trial court granted the motion as to the May 24, 1976, identification of McTush on the ground that it was impermissibly suggestive. The court said, however, that if evidence of an independent origin for the identification, apart from the identification made May 24, 1976, could be adduced, then Terrence could subsequently make an in-court identification of McTush. The court requested that defense counsel attempt to establish that there existed an independent origin for Terrence Watson's identification of McTush. The defense then called Terrence Watson and the following exchange occurred:

"Q. [MR. DEUTSCH] Okay. Now, what happened when you looked in that window? What did you see?

A. Well, I seen David Thomas hit McTush. I seen this man hit McTush in the mouth.

Q. Now, you seen David Thomas hit McTush in the mouth. Who's David Thomas?

A. The man that used to work in the battery shop.

Q. And when you saw—how did you know it was McTush?

A. He used to sit around the house.

Q. What house?

A. Over there where Stone lives at.

Q. Where is that?

A. Across the street from my house.

Q. What else did you see when you looked in that window?

THE COURT: I don't have to go any further.

MR. ROBBINS: I will object, your Honor.

THE COURT: I don't have to go any further. I have heard enough. This witness is competent. He has an independent basis on which he can make a judgment and identification and I so hold.

I will prohibit the State from offering any evidence with reference to his photographic identification. You can

cross-examine him in the presence of the jury and let the jury determine his believability with reference to his identification of your client.

The motion to suppress will be denied—sustained in part and denied in part. All right. Step down, son."

Subsequently, at McTush's trial, the defendant, on cross-examination of Terrence, asked Terrence questions concerning his identification of Stone on May 24, 1976. On redirect examination, the State also asked Terrence several questions concerning Terrence's identification of Stone. No questions were asked of Terrence concerning his out-of-court identification of McTush. Terrence did testify in detail, however, as to his observation of McTush and Stone on February 20, 1976. Terrence also testified that he did not tell the police that he knew McTush soon after he observed the offenses being committed because he was afraid. Finally, Terrence testified that McTush occasionally lived with Stone across the street from him and he indicated which house on a diagram.

On appeal of McTush's conviction and sentence, the appellate court vacated the judgments of conviction against him, pending a hearing in the trial court at which the State would be given an opportunity to prove the reliability of the in-court identification and its origin independent of any improperly suggestive identification procedure.

Thus, the issue presented is whether Terrence's in-court identification of McTush was based on an out-of-court photographic identification which was so impermissibly suggestive as to create a substantial risk of irreparable misidentification. In *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, the defendant was convicted of armed robbery of a federally insured savings and loan association. The evidence which the defendant argued tainted the witnesses' in-court identifications consisted of at least six photographs, most of

which were group photographs, in which the defendant, Simmons, and another defendant appeared. Each of five employees of the savings and loan separately identified Simmons as one of the robbers. At trial, the government did not introduce any evidence concerning the photographs, but relied upon in-court identification by the five eyewitnesses, each of whom testified that Simmons was one of the robbers. (390 U.S. 377, 382, 19 L. Ed. 2d 1247, 1252, 88 S. Ct. 967, 970.) The court stated that despite the hazards of identification by photograph, those hazards are substantially lessened by the opportunity afforded to defense counsel to cross-examine an eyewitness at trial and thereby expose any potential for misidentification. Thus, the court concluded:

"[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.)

(Accord, *Coleman v. Alabama* (1970), 399 U.S. 1, 5-6, 26 L. Ed. 2d 387, 394, 90 S. Ct. 1999, 2001.) The court in *Simmons* subsequently rejected the defendant's due process attack on his conviction by finding that any suggestion in the pretrial identification had not affected the fairness of the in-court identification, first, because it was essential for FBI agents swiftly to determine whether they were accurate in pursuing those suspects. The court continued:

"In the second place, there was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-

lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion." *Simmons v. United States* (1967), 390 U.S. 377, 385, 19 L. Ed. 2d 1247, 1254, 88 S. Ct. 967, 971-72.

While it is the defendant's burden to establish that the pretrial confrontation was impermissibly suggestive (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 511), once accomplished, the State may nevertheless overcome that obstacle, by a clear and convincing showing, based on the totality of the surrounding circumstances, that "the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime." *Manson v. Brathwaite* (1977), 432 U.S. 98, 122, 53 L. Ed. 2d 140, 159, 97 S. Ct. 2243, 2257 (Marshall, J., dissenting); *People v. Lee* (1973), 54 Ill. 2d 111, 118.

The State has not disputed the point in its briefs, and therefore has in effect conceded, that the photographic identification procedure used in this case was suggestive. Since the case has reached us in this posture, we do not pass on the question of suggestiveness. Moreover, though the trial court erred in requesting the defendant to go forward to establish evidence of independent origin at the suppression hearing, that error is not relevant

herein. We are not concerned with Terrence's testimony during the suppression hearing since he testified as to how he knew McTush again at trial. In any event, since defense counsel acquiesced to eliciting evidence of independent origin from Terrence during the suppression hearing, and voiced no objection, any error is waived. We are only concerned with whether an independent origin exists to establish separate reliability for Terrence's in-court identification testimony, or, negatively stated, whether the suggestive procedure created a substantial risk of misidentification, without a sufficient, separate basis of reliability. (See generally E. Cleary & M. Graham, Illinois Evidence sec. 611.17, at 325-26 (3d ed. 1979).) It was stated in *Manson v. Brathwaite* that "reliability is the linchpin in determining the admissibility of identification testimony ***." (432 U.S. 98, 114, 43 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253.) The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. (*Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; see *People v. Manion* (1977), 67 Ill. 2d 564, 571.) This court has added another factor in determining whether a witness' identification has an independent origin: "any acquaintance with the suspect prior to the crime." *People v. Blumenshine* (1969), 42 Ill. 2d 508, 514.

Applying those factors to this case, we think that though there is no direct evidence of lighting conditions which would have enabled Terrence Watson to view the crime, Terrence's description of what he saw inside the battery shop creates a clear implication that the lighting was sufficient. Terrence testified that he saw Thomas, one

of the victims, strike McTush; he saw McTush shoot Thomas and then search the victim's pockets. Terrence also saw Stone walk through the shop to the back room. It is certainly reasonable to infer that Terrence was afforded ample time and lighting to witness these acts. See *People v. Allender* (1977), 69 Ill. 2d 38, 43-44.

Secondly, Terrence's detailed depiction of events indicates that he was closely attentive to the enactment of the murder and armed robbery. The fact that he ran from the scene of the crimes when the men turned and looked at him evinces the conclusion that he was cognizant of the gravity of the scene he had witnessed and that he had viewed it with the close attention accorded unusual occurrences.

Thirdly, Terrence described McTush to the investigating police officers as wearing a black leather coat. At trial, he stated that the person he later identified as McTush wore a gray leather jacket on February 20, 1976. We do not think the minor discrepancy between the two descriptions of the leather coat materially diminishes the reliability of the identification.

Fourth, Terrence was certain at the May 24, 1976, photographic identification that McTush was the man who accompanied Stone at the battery shop on February 20, 1976. Moreover, the fact that Terrence also stated on May 24, 1976, that McTush was the same man he saw in the lineup on March 18, 1976, reduces the impact of his failure to identify McTush on March 18. Additionally, although there was no explanation in the record as to why he ceased being afraid, we find plausible Terrence's testimony that he did not identify McTush on March 18 because he was afraid, especially since Terrence was only 11 years old at the time he witnessed the offenses.

Fifth, while three months passed between the crime and the confrontation, in the intervening time Terrence viewed the defendant McTush in a lineup. Finally, and

most significantly, Terrence testified at both the suppression hearing and at trial that he had seen McTush "four or five times" prior to February 20, 1976, and that McTush was an acquaintance of Terrence's brother. Therefore, we think that an "informed judgment" (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 513) is inferable from the record that an independent origin for Terrence's in-court identification has been clearly and convincingly established so as to assuage any risk of misidentification. (Accord, *People v. Allender* (1977), 69 Ill. 2d 38 (where a police officer had ample independent basis for making a positive in-court identification of defendant when he observed defendant and another man for 15 or 20 seconds through a window, though his vision was obscured by dirt and protective bars on the window); *People v. Robinson* (1969), 42 Ill. 2d 371, 375-76; *People v. Nelson* (1968), 40 Ill. 2d 146, 151 (defendants were known to the eyewitnesses prior to the commission of offenses).) Accordingly, no need exists to remand to the circuit court for an evidentiary hearing regarding an independent origin of reliability for Terrence's in-court identification. The judgment of the appellate court vacating the convictions of McTush and remanding the cause to the circuit court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*