# Illinois Official Reports

## Appellate Court

*People v. Jacobs*, 2016 IL App (1st) 133881

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC JACOBS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-3881 |
| Filed | September 29, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-2733; the Hon. Joseph G. Kazmierski, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Byron M. Reina, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Brandon Hudson, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1      After being arrested in Chicago while driving a car that had been stolen in Peoria by an individual named Brian Lamb, defendant Eric Jacobs was convicted of possession of a stolen motor vehicle (PSMV) and sentenced to nine years' incarceration. On appeal, he raises several issues: (1) that the State did not prove beyond a reasonable doubt that he knew the vehicle was stolen; (2) that the trial court erroneously admitted the testimony of Jason Fox, the son of the car's owner, because that testimony included a unreliable identification of defendant and improper other-crimes evidence; (3) that the trial court denied defendant his right to present a defense when it excluded evidence that Lamb had been arrested for, and confessed to, the theft of the vehicle; (4) that the prosecutors trying the case engaged in misconduct by violating the trial court's evidentiary rulings and making improper closing arguments; and (5) that the trial court erred in denying defendant's request for an instruction on the lesser-included offense of criminal trespass to a vehicle.

¶ 2      We agree that the trial court erred in admitting Jason Fox's testimony to the extent it contained improper other-crimes evidence. Jason testified that his parents' home was burglarized and that the burglar stole his father's car and his mother's jewelry. He then testified that, while searching local pawn shops for his mother's jewelry, he saw defendant come out of a pawn shop and enter his father's car. That testimony carried with it the clear inference that defendant was somehow involved with the burglary of the Fox home, a crime for which defendant was not on trial and with which he could not be linked.

¶ 3      And the trial court improperly precluded defendant from introducing evidence that someone else—Brian Lamb—had been arrested for the burglary. Thus, defendant was left unable to counter the prejudicial effect created by Jason's testimony. Because of the unfair prejudice created by this evidence, the trial court abused its discretion in admitting it, and defendant is entitled to a new trial.

¶ 4                         I. BACKGROUND

¶ 5      In January 2013, James Fox's 2005 Kia was stolen from his Peoria, Illinois, home while he and his wife were on vacation in Florida. Brian Lamb was eventually arrested for the theft and, according to police reports in the record, confessed to breaking into James's house. Lamb also took jewelry during the break-in. On January 20, 2013, police saw defendant driving the Kia in Chicago and arrested him. The only contested issue at defendant's trial was whether he knew that the car was stolen.

¶ 6                         A. Pretrial Proceedings

¶ 7      Prior to his trial, defendant moved to exclude evidence that Jason Fox, James's son, had seen defendant in the car in the parking lot of a Peoria pawn shop on January 19, 2013. Defendant argued that any in-court or prior identification by Jason would be unreliable because the police showed Jason a single photograph of defendant and Jason identified defendant as the person he had seen on January 19. Defendant added that no physical lineup or photo array had been performed.

¶ 8      At the hearing on defendant's motion, the State explained that Jason saw a photograph of defendant at the police station on January 21, 2013, and told the police that the photograph

looked like the person he had seen in his father's car two days earlier. The State indicated that it did not plan to introduce any evidence regarding Jason's identification of the photograph. But, the State argued, it "may ask him to make an in-court identification," which the State did not know if Jason would be able to make. The trial court barred any testimony regarding Jason's identification of defendant in the single photograph but did not preclude an in-court identification.

¶ 9 After the trial court made its ruling, defense counsel argued that permitting the State "to ask [Jason] to identify a person who is the only black guy who is sitting at counsel table is extremely suggestive." Defense counsel added that, without a prior identification, the in-court identification would be unreliable. The trial court said that it would not prohibit an attempt at an in-court identification, stating, "If [the identification] is sketchy, the jury can make that determination and disregard it if they wish."

¶ 10 Defendant also moved to exclude "[a]ny mention of other property that was stolen in the *** burglary of *** Jason Fox's home" and "[a]ny insinuation that [defendant was] responsible for the residential burglary of the Fox home." The trial court granted those requests.

¶ 11 The State moved to exclude testimony, from the police officer who arrested Lamb, that Lamb had confessed to taking the car. The trial court excluded that testimony, finding that it would be inadmissible hearsay. Defense counsel asked for permission to introduce testimony that the officer had arrested Lamb for the burglary of the Fox home, but the trial court ruled that that evidence would also be hearsay.

¶ 12 The trial court also permitted the State to introduce, for impeachment purposes, evidence that defendant had been convicted of residential burglary in 2009.

¶ 13                                B. Trial and Posttrial Proceedings

¶ 14 In its opening statement, the State described the burglary of James's home:

> "In January of this year, *** Mr. and Mrs. Fox were in Florida. And while they were there enjoying their retired life, their home in Peoria, Illinois, was being burglarized. Because they were out of state, their son Jason responded to the burglary and when he arrived at their house, he went through the home with the Peoria Police Department looking to see what, if anything, had been stolen. And Jason and the police discovered a basement window that had been broken into the home and they noticed that Mrs. Fox's jewelry had been stolen as well as the couple's car, a Kia SUV.
>
> Well, the Foxes assumed that their car was long gone and probably their jewelry and they would never see these time [*sic*] again that they worked hard to acquire."

Defense counsel objected to this statement, but the trial court overruled the objection. The State then added, "Jason decided he would do his best to see if he could find his mother's jewelry. And so he went to different pawn shops in Peoria looking for his mom's jewelry." The State said that, while in the parking lot of a pawn shop, he saw his parents' car.

¶ 15 James Fox testified that he was 82 years old at the time of the trial and that he lived in Peoria with his wife. He owned a silver 2005 Kia sport utility vehicle (SUV). In January 2013, James and his wife went to Florida. James left the Kia in the garage and the keys to the car on the kitchen counter. James testified that he had not given defendant, or anyone else, permission to drive his car while he was gone.

¶ 16 On January 14, 2013, James received word that his house had been burglarized and that his car had been stolen. When James returned from Florida in March 2013, his car had been returned to the garage. James did not notice any damage to the car.

¶ 17 Jason Fox testified that, on January 14, 2013, he received a call from his mother and went to his parents' house. The police were already in the house. Jason noticed a window to the basement of the house had been broken and that the Kia was missing from the garage. Jason also testified that some of his mother's jewelry had gone missing. Defense counsel objected to the reference to the jewelry, but the trial court overruled the objection.

¶ 18 Jason testified that, on the afternoon of January 19, 2013, he went to a pawn shop in Peoria to see if he could find any of his mother's jewelry. In the parking lot, he noticed a car that looked like his father's. Jason got out of his car, walked behind the other car, and saw that the license plate number matched his father's car's license plate number. Jason walked back to his car and called 911.

¶ 19 Jason testified that he saw a man in the backseat of his father's car. The man got out of the Kia and knocked on Jason's window. Jason held up his hand and said, "I'm on the phone. One moment." The man knocked on the window again, and Jason said, "Dude, I'm on the phone." The man got back into the Kia.

¶ 20 Jason testified that, after the man knocked on his window, another man and a woman came out of the pawn shop together. Jason described the man as African-American, standing between six feet and six feet, two inches tall, with long, curly hair and a medium build. Jason described the woman as African-American and "stocky" with a fair complexion. The man got into the driver's seat of the Kia, the woman got into the front passenger's seat, and they drove away. Jason estimated that he was able to see the man's face for about 30 seconds before he got in the car.

¶ 21 The State asked Jason if he saw anyone in court that he had seen in the parking lot of the pawn shop. Defendant objected to the question, but the court overruled the objection. Jason identified defendant as the man he saw leave the pawn shop and drive his father's car away.

¶ 22 Jason testified that the Kia left the parking lot at a speed "higher than the posted speed limit." Jason followed the Kia for about four blocks in an area where the speed limit was 30 miles per hour. Jason estimated that, as he followed it, the Kia was traveling about 50 or 55 miles per hour.

¶ 23 Jason testified that, on January 20, 2013, he learned that his father's car was recovered in Chicago. He went to the police station in Chicago, where he saw his father's car. He did not notice any damage to the car, but the interior smelled like cigarettes, though neither of his parents smoked. He testified that the steering column was intact and that the radio was still in the car. Jason drove the car back to Peoria. Before his parents returned, Jason got the alignment of the car repaired because he noticed it was pulling to the left.

¶ 24 At a sidebar during Jason's testimony, defense counsel asked for permission to question Jason regarding statements the Chicago police made to him that undermined his identification of defendant. The court denied counsel's request to question Jason about the circumstances of his prior identification but permitted counsel to make an offer of proof outside the jury's presence.

¶ 25 At the offer of proof, Jason testified that, on January 20, 2013, he spoke to Officer Bill Caro of the Chicago police over the phone. Jason described the people he had seen leaving the

- 4 -

pawn shop, and Caro "said that looks like the same people we have in custody." Jason also testified that, while he was in the reception area of the police station in Chicago, he "saw a picture of *** defendant." Jason told Caro that he thought the photograph depicted "the gentleman [he] saw in Peoria driving [James's] car." Jason said that, in response, Caro "mentioned" defendant's name. After making the offer of proof, the court asked defense counsel if she wanted to ask Jason about "the picture he saw at the police station in front of the jury," but defense counsel declined.

¶ 26      After Jason finished testifying, defense counsel argued that the State had violated the ruling on the defense motion *in limine* by bringing up the jewelry taken from the Fox home both in its opening statement and through Jason's testimony. Defense counsel asserted that she should be able to introduce evidence to rebut any inference that defendant was responsible for the theft of the jewelry—specifically, evidence that Lamb was the burglar. The court maintained its ruling precluding defense counsel from eliciting such evidence.

¶ 27      Detective Randall Schweigert of the Peoria police department,[1] who investigated the burglary of James Fox's house, testified that he never charged defendant with the burglary and that he "never charged [defendant] with *** stealing any jewelry from that residence." Schweigert also testified that, when Jason described the man he saw at the pawn shop, he simply described him as a black man; Jason did not describe the man's hair, height, complexion, or weight to Schweigert. The court again denied defense counsel's request to ask Schweigert about his arrest of Lamb, and defense counsel made the following offer of proof:

        "Officer Schweigert if called to testify would testify that he arrested a person in this case for the residential burglary of the [Foxes' home], that if shown a picture marked as Defense Exhibit No. 1 that he would identify that person as Brian Lamb as a person that he arrested for the residential burglary ***, that after he arrested this person, Brian Lamb, for the residential burglary that he closed the case."

¶ 28      On the next day of the trial, defendant moved for a mistrial. Defense counsel argued that, by introducing evidence of the jewelry taken during the burglary along with evidence that defendant was at the pawn shop five days later, the State created an "insinuation *** that [defendant was] responsible for those crimes when he has not been charged." Defense counsel added that she had been deprived of the opportunity to rebut that insinuation with evidence "[t]hat [there was] another person who took sole responsibility for this."

¶ 29      The State responded that it needed to introduce evidence of the stolen jewelry in order "to explain why Jason Fox [was] at a pawn shop." And, the State added, the testimony that the defense intended to elicit regarding Lamb's confession would be through a police officer, making that evidence inadmissible hearsay. The State also noted that Schweigert had testified that he did not charge defendant with anything relating to the burglary.

¶ 30      The trial court denied the motion for a mistrial. The court noted that defendant was not charged with anything other than PSMV and that the evidence that defendant was at the pawn shop was relevant "[t]o show that the car was probably stolen or possibly stolen."

¶ 31      When the State resumed its case, Officer Caro testified that, on the afternoon of January 20, 2013, he was driving south on Sacramento Boulevard near Roosevelt Road in Chicago. Caro's car had "an automatic plate reader," which automatically scanned the license plates of passing

---

[1]For scheduling reasons, the defense called Schweigert out of order, while the State's case-in-chief remained open.

cars and told Caro if they had been reported stolen. The reader alerted Caro to a Kia SUV that he passed on Sacramento Boulevard, with the license plate No. 9920777.

¶ 32    Caro sent out a flash message describing the car and relaying the plate number, pulled a U-turn, and followed the Kia. Caro stayed about two blocks behind the Kia to avoid letting the driver know that he was following him. Eventually, Caro got stuck in traffic, and the Kia turned out of sight. Caro heard a message that another officer had begun to follow the Kia along Madison Street.

¶ 33    Caro eventually caught up to the Kia again, when he saw two other police cars pull it over. An officer ordered the driver, whom Caro identified as defendant, out of the car. Defendant did not try to run after he got out. Caro testified that a black woman was still sitting in the front passenger's seat of the Kia.

¶ 34    Caro testified that, while on the side of the road, he asked defendant who owned the car, and defendant said that "it belonged to a friend of his." Caro asked defendant his friend's name, and defendant replied, "I don't know." The prosecutor asked Caro if defendant gave him any details about his friend, including his name, and Caro said that defendant did not. After the roadside questioning, Caro arrested defendant and took him to the police station.

¶ 35    At the police station, Caro read defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). After defendant agreed to speak with him, Caro asked defendant who owned the car and how he got it. Caro testified, "[Defendant] told me that he rented it from a hype for $40 so he could drive into Chicago." Caro testified that the term "hype" was "a street term for a person who is addicted [to] drugs." Caro testified that defendant did not give him the name of the hype and did not say that he rented the car from Lamb, specifically. Caro also testified that he asked defendant when he was supposed to return the car and that defendant "couldn't answer" that question. Defendant objected to that testimony, and the trial court sustained the objection. The State again asked Caro what defendant said in response to the question of when he was supposed to return the car, Caro said defendant "couldn't answer," and the trial court again sustained defendant's objection to that testimony.

¶ 36    Caro testified that the Kia was in generally good condition. He testified that the car's steering column was not peeled, the ignition was not pulled out, and there were no wires hanging out to suggest that the car had been hot-wired. Caro also testified that the car's windows were not broken, that no locks had been pulled off of any of the doors, and that the radio had not been removed. The outside of the car had no visible damage.

¶ 37    Caro testified that, after he arrested defendant, he called Jason Fox to tell him that the police had the car. Caro testified that, when he spoke to Jason on the phone, Jason described the person he had seen at the pawn shop as "a male Black, about six feet [tall] with braids." Caro's reports did not contain any description of the person whom Jason Fox had allegedly seen at the pawn shop on January 19, 2013. Caro did not conduct any physical lineup or photo array for Jason.

¶ 38    At a sidebar, defense counsel requested permission to ask Caro whether Jason had viewed a report listing defendant's name as the arrestee in order to show that Jason's identification of defendant was suggested. The court denied defense counsel's request.

¶ 39    Defendant testified in his own defense. He stated that, on January 20, 2013, he planned to travel to Chicago from his house in Peoria to visit his grandmother. A man that defendant knew

only as "Q" picked him up in a silver SUV. Defendant described Q as being 5 feet, 10 inches or 5 feet, 11 inches tall, with "short-medium" dreadlocks.

¶ 40    Defendant said that Q drove him to a house where he met with a man named Brian. Q was a friend of defendant's cousin. Defendant had met Brian about a month earlier, through Q. On cross-examination, defendant testified that Brian was a drug addict.

¶ 41    Defendant testified that he gave Brian $40 to use his car, and Brian gave defendant his keys. Defendant said that he had seen Brian driving the car for about three or four days before January 20, so he thought that Brian owned the car. Defendant testified that he was supposed to return the car to Brian by 9:30 p.m. on the same day he rented it, January 20. He also admitted that he did not have a driver's license at the time.

¶ 42    When defendant got in the car, he did not notice any damage to the steering column, the interior, the locks, the windows, or the radio. He testified that the keys he had received from Brian worked in the car.

¶ 43    Defendant and his girlfriend drove to Chicago and stopped at a restaurant on Western Avenue. After they got their food, they began driving again, eating as they drove. The police pulled defendant over on Madison Street and ordered him out of the car.

¶ 44    Defendant testified that, once he got out of the car, a police officer asked where he got the car from, and defendant said, "I rented it from a hype for $40." Defendant testified that a hype was "[a] person that get[s] high." He testified that the police never asked him the hype's name. Defendant said that he did not find out that the car had been stolen until the police told him he was being charged with PSMV.

¶ 45    Defendant testified that he had never been to the pawn shop in Peoria where Jason said he saw defendant. Defendant testified that he had been convicted of residential burglary in 2009 and a "narcotics offense" in 2005.

¶ 46    On cross-examination, the State asked defendant if he ever told the police when he was supposed to return the car, and defendant replied, "He never asked, ma'am." Defendant gave the same answer when the State asked whether he told the police Brian's phone number.

¶ 47    At the close of the defense case, defendant again moved for a mistrial, this time on the basis that the State had elicited other-crimes evidence when it asked if defendant had a driver's license when he rented the car from Brian. The trial court denied the motion.

¶ 48    During the jury-instructions conference, defendant requested an instruction on the lesser offense of criminal trespass to a vehicle. The trial court denied the request because, if the jury believed defendant's testimony, "then it wouldn't even fall under the provision of the criminal trespass to vehicle."

¶ 49    After closing arguments, the jury found defendant guilty of PSMV. The trial court denied defendant's motion for a new trial and sentenced defendant to nine years' incarceration. Defendant filed this appeal.

¶ 50                                    II. ANALYSIS
¶ 51                                  A. Reasonable Doubt
¶ 52    Defendant first argues that the State failed to prove beyond a reasonable doubt that he knew that the car he was arrested in was stolen. In assessing the sufficiency of the evidence, we determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt.

*People v. Ross*, 229 Ill. 2d 255, 272 (2008). We will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *Id.* A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 53 The PSMV statute requires the State to prove that a defendant possessed a stolen vehicle with knowledge that it had been stolen. 625 ILCS 5/4-103(a)(1) (West 2012). Knowledge is a question of fact for the jury. *People v. Abdullah*, 220 Ill. App. 3d 687, 690 (1991). Direct proof of knowledge is not necessary; it may be proven by "circumstances that would induce a belief in a reasonable mind that the property was stolen." *Id.* A defendant's exclusive, unexplained possession of a stolen car gives rise to an inference that the defendant knew that the vehicle was stolen. 625 ILCS 5/4-103(a)(1) (West 2012); *People v. Gentry*, 192 Ill. App. 3d 774, 775-79 (1989). The defendant "may attempt to rebut the inference of guilty knowledge which arises from the possession of a stolen vehicle, but the defendant must offer a reasonable story or be judged by its improbabilities." *Abdullah*, 220 Ill. App. 3d at 691. Nor is the trier of fact required to accept the defendant's version of the facts. *Id.*

¶ 54 In this case, it was undisputed that defendant was arrested while driving James Fox's Kia, and that the Kia had been stolen from Fox's garage. Thus, the jury could permissibly draw an inference that defendant knew the car was stolen.

¶ 55 While defendant testified that he had rented the car for $40 from an acquaintance for a one-day, round-trip drive from Peoria to Chicago and back, the jury was not required to accept his explanation of his possession of the stolen car. Officer Caro testified that defendant gave him different explanations for his possession of the car: he first said that he borrowed the car from a friend whose name he did not know, then said that he rented the car from an unnamed drug addict.

¶ 56 There was thus sufficient evidence on which the jury could rely to reject defendant's explanation for his possession of the stolen car. It was the jury's prerogative to assess the credibility of defendant's story, and, in light of the evidence supporting the jury's rejection of his testimony, we will not second-guess its assessment.

¶ 57 Defendant cites *People v. Gordon*, 204 Ill. App. 3d 123, 128 (1990), where this court held that the State failed to prove a defendant's knowledge in a PSMV case, alleging that this case is factually similar. In *Gordon*, the evidence showed that the owner of the car had previously loaned it to his friend, Chris Jackson, although the owner had not loaned the car to Jackson on the day in question. *Id.* at 124. The owner said that, if he knew that Jackson had taken the car, he would not have reported it stolen. *Id.* The defendant was arrested while driving the car with Jackson. *Id.* The keys were in the ignition. *Id.* at 127. The defendant testified that he had seen Jackson drive the car before, that he thought it belonged to Jackson, and that Jackson had asked him to fix the radio of the car. *Id.* at 125. Other witnesses testified that the defendant had repaired their car radios in the past. *Id.* When the defendant was pulled over in the car, he did not try to flee, and there "were no signs of unauthorized entry into the vehicle." *Id.* at 128.

¶ 58 We do not agree that *Gordon* compels us to reverse defendant's conviction in this case. Unlike *Gordon*, where there was evidence that the car's owner had previously loaned the car to one of the individuals found in it, there was no evidence in this case the James Fox had ever given the car to Brian or defendant before. And there was evidence in *Gordon* corroborating the defendant's explanation that he had been hired to fix the car's radio: other witnesses

testified that they had previously hired the defendant to do such work. Here, there was no evidence to corroborate the notion that Brian had rented his car out to defendant or anyone else before.

¶ 59    We acknowledge that the pristine condition of the vehicle, at the time that defendant was caught driving it, was not suggestive in any way that the car had been stolen. That is not surprising, given that it was not stolen off the street, but rather when the car keys were stolen from the Foxes' kitchen counter. Still, it is an evidentiary point in defendant's favor. See *Abdullah*, 220 Ill. App. 3d at 691 ("[t]he condition of the vehicle is one of the most significant factors which courts consider in determining whether or not the defendant had knowledge of the vehicle's theft"). But the jury heard that evidence, weighed it along with the other evidence, and still found defendant guilty.

¶ 60    We find that the State presented sufficient evidence to prove defendant's knowledge. His unexplained possession of the car gave rise to an inference that he knew it was stolen, and his explanation for his possession conflicted with other evidence such that the jury could reasonably reject his explanation.

¶ 61                                    B. Testimony of Jason Fox

¶ 62    Defendant next contends that the trial court erred in admitting two portions of Jason Fox's testimony. We first address defendant's argument that Jason should not have been able to testify regarding defendant's link to jewelry taken from his parents' house because that evidence constituted impermissible other-crimes evidence. Jason testified that he had gone to the pawn shop to recover his mother's stolen jewelry and that he saw defendant at that pawn shop, testimony that, according to defendant, created a suggestion that defendant was involved with the theft and sale of the jewelry.

¶ 63    As we recounted earlier, the trial court initially agreed with defendant, granting the portion of defendant's motion *in limine* requesting exclusion of "[a]ny mention of other property that was stolen" from the Fox home. But when the State proceeded to mention the stolen jewelry and the pawn shop in its opening statement and then introduced the evidence of the jewelry and pawn shop through Jason's testimony, the trial court overruled defense objections. The court also denied defendant's request for mistrial on this ground, reasoning that the evidence of the stolen jewelry was relevant "[t]o show that the car was probably stolen or possibly stolen."

¶ 64    A trial court's ruling on the admissibility of evidence, and its balance of the probative nature of that evidence versus its prejudicial impact, is left to the sound discretion of the court and will be reversed only for an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶¶ 11-12. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or so unreasonable that no reasonable person would adopt the trial court's view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 65    Other-crimes evidence is inadmissible if it is used to show a defendant's propensity to commit crimes. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Heard*, 187 Ill. 2d 36, 58 (1999). Evidence of other crimes may be admitted for other purposes, such as proving a defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). "In fact, [the supreme] court has held that evidence of other crimes committed by the defendant may be admitted if relevant to establish any material question other than the propensity to commit a crime." (Internal quotation marks omitted.) *People v. Pikes*, 2013 IL 115171, ¶ 13.

¶ 66 Defendant argues that, by Jason telling the jury about the Fox burglary and the jewelry theft, the police's advice to him to visit pawn shops to search for the stolen jewelry, and then his encountering defendant at one of those pawn shops, the jury could infer that defendant was part of the break-in at the Fox home, and thus part of the initial theft of the vehicle he was caught driving.

¶ 67 The State argues that the admission of this evidence of the Fox home burglary, the theft of the jewelry, and the police's advice to Jason to visit pawn shops to search for the missing jewelry was proper under the continuing-narrative exception to the prohibition of other-crimes evidence. The State contends that this evidence explained why Jason was visiting a pawn shop in the first place and provided background for Jason's identification of defendant while he was driving his parents' stolen car, the day before defendant was stopped in Chicago.

¶ 68 Under the continuing-narrative exception, evidence of a defendant's other bad acts is admissible where the " 'other *** acts are all a part of the continuing narrative which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes.' " *People v. Adkins*, 239 Ill. 2d 1, 32 (2010) (quoting *People v. Marose*, 10 Ill. 2d 340, 343 (1957)). The exception will not apply, "even when the crimes occur in close proximity, if the crimes are distinct and 'undertaken for different reasons at a different place at a separate time.' " *Adkins*, 239 Ill. 2d at 33 (quoting *People v. Lindgren*, 79 Ill. 2d 129, 139-40 (1980)); see also *People v. Johnson*, 34 Ill. 2d 202, 206 (1966) (in trial of defendant charged with stealing from sleeping train passenger, testimony that he stole from another sleeping passenger on same train was part of continuing narrative).

¶ 69 But even if we accepted the State's invocation of the continuing-narrative exception, we question the probative value of that evidence. The State could have just as easily established that Jason saw defendant with the stolen vehicle without creating an inference that defendant was involved with the burglary and the jewelry theft at the Fox home. Jason could have simply testified that he saw his father's car in the parking lot of a store, without detailing what kind of store it was. There was no need to specify that, while on a mission searching for the jewelry taken during the burglary, he happened to see defendant at a pawn shop—the very type of store at which the police who were investigating the burglary told Jason to look for his mother's jewelry. There was no reason that the jury had to hear any mention whatsoever of stolen jewelry or the pawn shop. Thus, even were we to credit the State's continuing-narrative argument, the probative value of this evidence was slight at best.

¶ 70 In contrast, the prejudicial impact of this evidence substantially outweighed any probative value. See *Pikes*, 2013 IL 115171, ¶ 11 (other-crimes evidence should not be admitted if prejudicial effect substantially outweighs probative value). The evidence of the jewelry and the pawn shop not only created an unmistakable inference that defendant was involved in another crime for which he was not on trial, but it directly impacted his theory of the case. Defendant testified that he did not know the Fox car was stolen, and the other-crime evidence strongly suggested that defendant knew the car was stolen—because he, in fact, was the one who stole it.

¶ 71 Defendant, who began the trial under the impression that evidence of the stolen jewelry was off-limits, was suddenly forced to dispel the improper suggestion that he was involved in the uncharged burglary. Defendant had to call a witness, Detective Schweigert, to at least partially rebut the notion, and defense counsel devoted significant time in her closing argument to refuting the notion that defendant had anything to do with the burglary itself. "Even if

- 10 -

other-crimes evidence is relevant, it must not become the focal point of the trial. [Citation.] The trial court should prevent a mini-trial of a collateral offense." (Internal quotation marks omitted.) *People v. Hale*, 2012 IL App (1st) 103537, ¶ 24.

¶ 72　　To make matters worse, defendant was prevented from offering evidence that another individual, Brian Lamb, had been arrested for the burglary of the Fox home. At trial, defendant sought to elicit testimony from Detective Schweigert that he had arrested Lamb for the burglary of the Foxes' home. The trial court prevented defendant from doing so, ruling that Schweigert's testimony would be inadmissible hearsay.

¶ 73　　We disagree that this excluded evidence was hearsay. The hearsay rule only applies to statements. See Ill. R. Evid. 801(c) (eff. Jan. 1, 2011) (" 'Hearsay' is a *statement*, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (Emphasis added.)). A "statement," for purposes of the hearsay rule, is either "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a) (eff. Jan. 1, 2011). Here, Schweigert would not have recounted a statement. Schweigert would have simply been relaying an *event*—his arrest of Lamb. There was no assertion of fact that would have been reproduced in court had Schweigert testified that he arrested Lamb for the burglary.[2]

¶ 74　　The exclusion of evidence that Lamb had been arrested for the burglary was critical, because "the concerns underlying the admission of other-crimes evidence are not present when the uncharged crime or bad act was not committed by the defendant." *Pikes*, 2013 IL 115171, ¶ 16. The fact of Lamb's arrest for the burglary could have dispelled much of the prejudice created by the evidence of the burglary and the stolen jewelry. Instead, defendant found himself unnecessarily fighting off an uncharged burglary offense that directly impacted the defense's theory of the case, while being prevented from offering potent, available evidence that someone else had committed that offense.

¶ 75　　The State notes that defense counsel was able to limit any damage by eliciting Schweigert's testimony that he did not arrest defendant for the burglary, but the mere fact that Schweigert had not arrested defendant for the burglary did not dispel the notion that defendant committed it. Instead of learning that the Fox burglary had resulted in the arrest of someone other than defendant, the jury was left with the impression that the crime had remained unsolved. In fact, coupled with the evidence that defendant was seen leaving a pawn shop where Jason had gone to search for his mother's jewelry, the fact that defendant had not been arrested could lead to an inference that defendant had committed a burglary and gotten away with it. Defendant could only truly eliminate the prejudicial effect of the other-crimes evidence by connecting Lamb to the burglary.

¶ 76　　The risk of unfair prejudice was also elevated because defendant had a prior conviction for residential burglary. We do not mean to suggest that the trial court erred in admitting evidence

---

[2]It appears that the trial court correctly categorized Schweigert's testimony that Lamb *confessed* to the burglary as hearsay. Schweigert would have repeated an out-of-court statement (the confession) used to prove the truth of the matter asserted in that statement (that Lamb committed the burglary). We do not consider this ruling as part of our prejudice analysis, nor do we consider whether Schweigert could have testified to the confession under some exception to the hearsay bar. See Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011) (providing for admission of hearsay statements made against declarant's penal interest where declarant is unavailable to testify).

of defendant's prior conviction as impeachment evidence—it did not. See Ill. R. Evid. 609(a) (eff. Jan. 1, 2011) (evidence of prior conviction may be used to impeach witness). But Jason's testimony suggested that defendant was involved in the burglary of the Fox home, and the jury heard that defendant had been convicted of the very same offense. Defendant's prior conviction thus amplified the risk of unfair prejudice, as it could have increased the risk that the jury would conclude that defendant was more likely involved in the Fox burglary because of his prior burglary. And we emphasize that defendant's prior burglary conviction was not a conviction for the same crime for which defendant was on trial—it was a conviction for the same *uncharged* offense to which the State impermissibly linked defendant.

¶ 77    For all of these reasons, we hold that the admission of Jason's testimony regarding the jewelry stolen from the Fox home, and his subsequent identification of defendant at a pawn shop, was an abuse of discretion. The abuse-of-discretion standard, though admittedly the most deferential standard of review in the law, is not a rubber stamp. See *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006). Under the specific circumstances of this case, we hold that the risk of unfair prejudice posed by that evidence substantially outweighed its minimal probative value.

¶ 78    We now turn to the question of whether the trial court's error in admitting this evidence was harmless. The improper admission of other-crimes evidence is harmless when a defendant is neither prejudiced nor denied a fair trial because of its admission. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 28. The State bears the burden persuading this court, beyond a reasonable doubt, that the result of the trial would have been the same without the admission of the improper evidence. *Id.*

¶ 79    We conclude that the admission of the other-crime evidence in this case was not harmless beyond a reasonable doubt. Our supreme court has stated that "[t]he erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). This is such a case. As we have already explained, the challenged evidence created the distinct inference that defendant had participated in the burglary of the Fox home and thus that defendant had stolen the Foxes' car, directly impacting his claim at trial that he did not know the vehicle was stolen.

¶ 80    Nor did the trial court issue a limiting instruction to the jury to alleviate the possible prejudice. See *Gregory*, 2016 IL App (2d) 140294, ¶ 30 (in considering whether improper other-crimes evidence was harmless, noting that "[t]here was no limiting instruction *** to the jury, which thus was free to consider the [evidence] in any manner that it saw fit, including as evidence of propensity"). The court thus failed to mitigate the risk that the jury drew the improper inference that defendant was the burglar.

¶ 81    Because the trial court abused its discretion in admitting Jason's testimony regarding the jewelry and the pawn shop, and that error was not harmless beyond a reasonable doubt, we vacate defendant's conviction and remand for a new trial.

¶ 82    Defendant raises two additional objections to Jason's testimony, which we address only to the extent they are likely to recur on retrial. See *People v. Jones*, 105 Ill. 2d 342, 353 (1985) (when remanding for new trial on one issue, court should consider other issues only if likely to recur on retrial).

¶ 83    First, defendant argues that the State introduced improper other-crimes evidence when Jason testified that defendant sped out of the parking lot of the pawn shop—in other words, the court allowed the State to introduce evidence that defendant broke the speed limit while

driving away. But the State did not use that testimony to show defendant's propensity to drive recklessly; it used defendant's speeding to show his guilty knowledge. In its closing argument, the prosecution argued, "As [Jason] Fox was trying to stay into [*sic*] the speed limit, the defendant was pulling away from him going 50 to 55 miles an hour ***. That shows his consciousness of guilt." This was a permissible purpose for the evidence. See *People v. Abernathy*, 402 Ill. App. 3d 736, 755 (2010) (other-crimes evidence admissible to prove defendant's consciousness of guilt).

¶ 84    Second, defendant contends that Jason's in-court identification of defendant was tainted and inadmissible, because he made it after seeing a single photograph of defendant at the police station and after Officer Caro had told him that the photograph was a picture of the person in custody for possessing the stolen vehicle.

¶ 85    An in-court identification that is based on an out-of-court photographic identification is inadmissible where the out-of-court identification is "so impermissibly suggestive as to create a substantial risk of irreparable misidentification." *People v. McTush*, 81 Ill. 2d 513, 518 (1980). But even where an out-of-court identification is impermissibly suggestive, "the State may nevertheless overcome that obstacle, by a clear and convincing showing, based on the totality of the surrounding circumstances, that the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime." (Internal quotation marks omitted.) *Id.* at 520. When considering whether an in-court identification has a sufficient independent basis from a suggestive pretrial identification, a court must consider several factors: the witness's opportunity to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, the length of time between the crime and the confrontation, and any acquaintance the witness had with the suspect prior to the crime. *Id.* at 521; see *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 86    We decline to reach the admissibility of Jason's in-court identification because it appears that the trial court did not conduct a full analysis of this question. The trial court excluded Jason's identification of defendant in the photograph at the police station but did not appear to consider whether Jason's photographic identification of defendant at the police station tainted his in-court identification, or whether the State could overcome that taint by clear and convincing evidence. Instead, the trial court simply left it to the jury to consider whether the identification was "sketchy." On retrial, should defendant challenge the admissibility of Jason's in-court identification, the court should consider it under the rubric outlined by our supreme court in *McTush*.

¶ 87                            C. Prosecutorial Misconduct

¶ 88    Defendant next contends that the prosecution committed misconduct in its opening statement, direct examination of Officer Caro, and closing arguments. We address defendant's arguments only to the extent that we find them likely to recur on retrial.

¶ 89    Defendant first argues that, in its opening statement, the prosecution "blatantly violated the judge's pre-trial ruling barring it from mentioning the theft of *** jewelry." But as we have held that the evidence of the jewelry is inadmissible on retrial, this issue is not likely to recur.

¶ 90    Next, defendant contends that the prosecutor improperly elicited testimony from Officer Caro regarding defendant's silence in response to questions Caro asked him on the day

defendant was arrested. Defendant contends that the prosecutor committed misconduct in eliciting this evidence—or at least attempting to—because, prior to trial, she "assured the judge, and defense counsel, that [she] would not use [defendant's] silence against him."

¶ 91 Caro's testimony about defendant's silence concerned two different time periods and locations. One such instance happened at the police station, the other on the roadside after the police pulled defendant over in the vehicle. We consider each of these instances in turn.

¶ 92 Defendant's conversation with Caro at the police station occurred *after* defendant had been arrested and been given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court held that "the use *** of [an arrestee's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." But "*Doyle* applies only when a defendant invokes his right to remain silent." *People v. Patterson*, 217 Ill. 2d 407, 445 (2005). "Once the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent." *Id.*

¶ 93 Here, Caro testified that he advised defendant of his *Miranda* rights and that defendant agreed to speak with him. Thus, defendant waived his right to remain silent. See, *e.g.*, *People v. Hart*, 214 Ill. 2d 490, 513 (2005) (defendant waived right to silence where he "agreed to speak with [detective] and 'make a statement' "). Accordingly, the State was entitled to introduce the entirety of the conversation, including the fact that defendant could offer no specifics regarding his rental agreement with Brian. See *People v. Brown*, 222 Ill. App. 3d 703, 713-14 (1991) ("[W]here a defendant has been advised of his *Miranda* rights and subsequently waives them, the jury may consider the *entire communicative process* in order to better evaluate the meaning and accuracy of the statements that were made." (Emphasis added.)).

¶ 94 Turning to defendant's silence at the roadside, defendant argues that "pre-arrest silence in response to police questioning is generally inadmissible as substantive evidence." After considering this issue, we concluded that a recent decision of the United States Supreme Court, *Salinas v. Texas*, 570 U.S. ___, 133 S. Ct. 2174 (2013), was directly relevant to the question of the admissibility of a suspect's noncustodial silence and asked the parties for supplemental briefing on the impact of *Salinas*. In his supplemental brief, defendant argued for the first time that he was in custody while questioned at the roadside, rendering *Salinas* inapplicable.

¶ 95 We decline to reach the issue of the admissibility of defendant's roadside silence because it would require us to resolve the issue of whether defendant was in custody during the traffic stop, an issue that the trial court never had the opportunity to reach. We leave this question to the trial court on retrial, should the State once again attempt to introduce evidence of the roadside conversation between the police and defendant and should defendant challenge its admissibility.

¶ 96 Defendant's final prosecutorial-misconduct argument is that the prosecution committed misconduct several times during its closing arguments. We decline to consider the propriety of the State's closing argument, as it is unlikely to recur on retrial. See, *e.g.*, *People v. Orr*, 149 Ill. App. 3d 348, 362 (1986) (declining to consider defendant's claim "that the State's closing arguments were improper" because it was unlikely to recur on retrial); *People v. Guthrie*, 123 Ill. App. 2d 407, 414 (1970) (same). We remind the State that its closing arguments must be confined to the evidence (*People v. Scott*, 108 Ill. App. 3d 607, 614 (1982)) and may not shift the burden of proof to defendant (*People v. Adams*, 281 Ill. App. 3d 339, 345 (1996)).

¶ 97                                   D. Lesser-Included Offense

¶ 98        Finally, defendant contends that the trial court erred in denying his request for a jury instruction on the offense of criminal trespass to a vehicle, which, he argues, was a lesser-included offense of PSMV. We decline to reach this issue, as we cannot be sure what the evidence on retrial will be or whether it will justify the delivery of an instruction on criminal trespass to a vehicle. See *People v. Jones*, 175 Ill. 2d 126, 132 (1997) (in deciding whether to give lesser-included offense instruction, court must determine whether "[v]ery slight evidence" existed to support instruction).

¶ 99                                          III. CONCLUSION

¶ 100       For the reasons stated above, we vacate defendant's conviction and remand for a new trial.

¶ 101       Vacated and remanded.