NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 241171-U

NO. 4-24-1171

IN THE APPELLATE COURT

FILED
August 12, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| PAYTON J. HATCH, | ) | No. 20CF2230 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's conviction of criminal sexual assault, holding (1) the trial court properly allowed evidence defendant threatened the victim with a knife as part of a continuing narrative of the events leading up to the crime, (2) defendant affirmatively acquiesced to jury instructions and could not show prejudice to establish ineffective assistance of counsel regarding the instructions, (3) the evidence was sufficient to convict defendant beyond a reasonable doubt, and (4) defendant was not entitled to sentencing credit for time spent on bail subject to a curfew.

¶ 2    In April 2024, a jury convicted defendant, Payton J. Hatch, of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1), (2) (West 2020)) in connection with the September 20, 2020, sexual assault of K.B. Defendant was found not guilty of another count of criminal sexual assault allegedly occurring on the same date against another victim, K.T.

¶ 3    Evidence at trial showed K.B. and K.T. were intoxicated at the time of the incidents, and there were various inconsistencies in their testimony. The State was allowed to

introduce evidence defendant threatened K.B. and another person with a knife before the sexual assault. The jury was instructed on the definition of "sexual penetration" and elements of the crimes using Illinois Pattern Jury Instructions, Criminal, No. 11.65E (4th ed. 2000) (hereinafter IPI Criminal 4th) and IPI Criminal 4th No. 11.55, which include the bracketed term "[or]" in places. The trial court did not include the word "or" when giving the instructions. At sentencing, the court denied defendant's request for sentencing credit for time spent on bail subject to a 12-hour curfew.

¶ 4        On appeal, defendant contends (1) the trial court erred in allowing evidence he threatened K.B. and another person with a knife, (2) the court plainly erred by removing bracketed language from the jury instructions or counsel rendered ineffective assistance by agreeing to the instructions, (3) the evidence was insufficient to convict him beyond a reasonable doubt, and (4) he was entitled to sentencing credit for time spent on bail subject to a 12-hour curfew. We affirm.

¶ 5                          I. BACKGROUND

¶ 6        In December 2020, the State charged defendant with three counts of criminal sexual assault. Count I alleged defendant knowingly committed an act of sexual penetration with K.B. by the use of force, in that defendant forced his penis into the mouth of K.B. and then held her head down on his penis (720 ILCS 5/11-1.20(a)(1) (West 2020)). Count II alleged defendant knowingly committed an act of sexual penetration with K.T., knowing K.T. was unable to give knowing consent, in that defendant placed his penis in the vagina of K.T., knowing K.T. to be intoxicated (*id.* § 11-1.20(a)(2)). Count III alleged defendant knowingly committed an act of sexual penetration with K.B., knowing that K.B. was unable to give knowing consent, in that defendant placed his penis in the mouth of K.B., knowing K.B. to be intoxicated (*id.*).

- 2 -

¶ 7                                  A. Conditions of Release

¶ 8        The trial court released defendant on bail on December 14, 2020. The court imposed conditions of release using a form titled "Additional Bond Conditions Order" with checked boxes, requiring defendant to (1) obey a curfew from 6 p.m. to 6 a.m.; (2) report to pretrial services as directed; (3) submit to random blood, breath, or urine drops; (4) abstain from alcohol and drugs; (5) undergo a mental health evaluation; (6) comply with all treatment recommendations; (7) sign releases for treatment providers; (8) have all employment approved by pretrial services; (9) have no contact with known gang members; (10) maintain a landline phone at his residence; (11) keep his residence open to inspection by pretrial services; (12) have no contact with the complaining witnesses; (13) reside at his parents' home; and (14) have no parties, guests, friends, or girlfriends at the residence. During the bond hearing, the court told defendant, "[Y]ou must comply with all my orders of pretrial release, or I'll be taking you back into custody."

¶ 9        In April and May 2022, the landline telephone at defendant's home was not working. During a May 19, 2022, hearing, Karen Dixon, the pretrial services officer overseeing defendant's conditions of release, told the trial court she allowed defendant to call twice per day by cell phone to confirm his curfew compliance because a landline was not available. Both the State and the court expressed concern over this procedure and emphasized the court was to be notified if defendant did not or would not comply with the conditions of pretrial release. The court then admonished Dixon that it was not up to pretrial services to develop a "workaround" because only the court could modify the conditions of defendant's bond. Dixon stated she understood and had mentioned to defendant that she could not modify the order and defendant should consult with his attorney.

¶ 10 The trial court remanded defendant to the custody of the sheriff because curfew compliance could not be confirmed through a call to the landline telephone. Defendant filed a motion to reconsider, in which he acknowledged, "Defendant understands that pretrial services may not modify the conditions of his bond, despite the pretrial services officer's suggestion to the defendant that he call into Pretrial Services twice daily during the period when the landline had not been restored," and he was later released on the same pretrial release conditions once landline phone service had been restored. In January 2024, the court modified defendant's curfew to require defendant to be at home from 10:30 p.m. to 6 a.m.

¶ 11 B. Pretrial Motions

¶ 12 Before trial, defendant moved *in limine* to exclude any undisclosed allegations or acts not included in the State's discovery materials. After jury selection, but before the trial started, the State informed the trial court it anticipated testimony would come out that defendant had a knife on the night of the incidents and threatened K.B. and another woman, Kennedy, with it outside the home where the sexual assaults later took place. K.B. had also told a detective the knife incident scared her. The State argued the testimony was not evidence of "another bad act" but instead was part of a continuing course of conduct and was relevant as circumstantial evidence pertaining to the use of force. Defendant argued the use of the knife was unrelated to the sexual assault allegations and irrelevant to the claims of use of force. He did not argue the evidence was more prejudicial than probative; instead, he contended any references to a knife were unrelated to the count alleging use of or threat of force. The court found the knife incident was part of a larger, several-hour incident and said it would allow the testimony.

¶ 13 C. Trial

¶ 14 At trial, K.T. testified that, on September 19, 2020, she was 17 years of age and

had been drinking and dancing at a friend's birthday party. At around midnight, K.T. went to defendant's home with K.B. There was alcohol at defendant's home, and K.T. estimated she had already consumed "a water bottle full" of straight alcohol before going there. There was a bonfire at defendant's home, and there were five other people there besides K.T. and K.B.

¶ 15 K.T. testified she was at defendant's home for a few hours, aside from leaving briefly to get food at McDonald's. After returning to the home with food, K.T. passed out on a couch in the basement. K.T. described the basement as a large area with a couch and a separate area she described as "[defendant's] room," which was blocked off with curtains. K.T. said defendant, K.B., and a person named Anthony were all in the basement. Defendant was aware K.T. had been drinking.

¶ 16 When K.T. woke up, Anthony was next to her on the couch. K.B. and defendant were on defendant's bed. At that time, everyone had their clothes on. K.T. testified she "kept going in and out of unconsciousness." At one point, K.T. woke up, and her pants were off. She had not taken them off herself. K.T. testified Anthony was next to her, and defendant was at the end of the couch. Neither Anthony nor defendant had clothes on. K.T. said she was still "in and out" of consciousness at that time.

¶ 17 K.T. testified she woke up again and defendant was on top of her, naked. She said she was on her back on the couch and defendant forced himself on her and penetrated her vagina with his penis. K.T. then passed out again. When K.T. woke up, defendant was gone. K.T. said she continued to go in and out of consciousness and eventually was able to leave with K.B. and Kennedy. She saw defendant and Anthony fighting outside.

¶ 18 On cross-examination, K.T. said Anthony was lying next to her when defendant was on top of her and Anthony had placed his fingers and penis in her vagina. However, she

- 5 -

stated she was sure defendant also penetrated her with his penis because she saw him do it. Defense counsel impeached K.T. with evidence she did not tell the police she saw defendant penetrate her. Instead, she had said she "guessed" defendant did so, but she later explained she was not actually guessing but uncomfortable talking about it when asked during the first interview. K.T. said she had a conversation with defendant's mother when she left the home but could not remember what was said.

¶ 19 K.B. testified she went to defendant's home with K.T. K.B. consumed alcohol and was intoxicated. She also used marijuana while there. Less than an hour after arriving, K.B. called Kennedy and asked Kenndy to come pick her up. K.B. testified that, when Kennedy arrived, defendant said she could not leave and pulled out a knife.

¶ 20 K.B. and Kennedy left but eventually returned. When asked why they returned, K.B. said, "It was not a smart decision on my behalf and I don't remember exactly what made me go back, but we did go back." Regarding the incident and referring to defendant, K.B. recalled telling an investigating officer, "We didn't want him to, like, do anything and we were kind of scared so we wanted to go back and make sure everything was okay."

¶ 21 When K.B. and Kennedy returned, defendant put the knife to K.B.'s throat while she was sitting in the passenger seat of the car and said he was going to kill Kennedy and her family because he was mad Kennedy was going to take K.B. home. K.B. could not remember what she did next, but she said she eventually got out of the car. She testified, "Eventually we kind of just forgot about that and we were just hanging out again back in the yard." Defense counsel generally objected to testimony about the knife but did not argue the evidence was more prejudicial than probative.

¶ 22 K.B. eventually went to the basement. She said K.T. and Anthony were sitting on

the couch and she, defendant, Kennedy, and a person named Randy were sitting on defendant's bed watching a movie. Defendant asked K.B. if she was drunk, and she said that she was. Defendant responded, "Good," which made K.B. uncomfortable and "a little scared."

¶ 23    While they were watching the movie, Kennedy and Randy left the room, and K.B. saw that K.T. and Anthony were under a blanket on the couch and the blanket was moving. Anthony moved the blanket and showed his penis to K.B. and defendant.

¶ 24    K.B. testified that defendant ripped a chain necklace from her neck, got on top of her, and pushed her down on her back. K.B. could not get up, and defendant tried to lift her shirt up. K.B. said she "froze up" and was scared to speak. She said she wanted to call out but could not speak.

¶ 25    K.B. testified defendant's pants were off and he moved around her and forced his penis into her mouth. Defendant held K.B. by her head or neck and kept holding her head when she tried to pull away. Defendant eventually let go, and K.B. ran out of the room. K.B. ran to Kennedy and remembered crying and talking to her. When they prepared to leave the house, K.B. walked toward the room to get K.T. to leave and saw K.T. lying down and Anthony and defendant both with their pants down. She testified, "I don't remember how we got out of there, but we ran out and got everybody and walked out the door."

¶ 26    The next day, K.B. went to the hospital and competed a sexual assault kit. She said there was a bruise on her neck. K.B. testified defendant called her the same day from a different number and apologized to her. He also told her, "You have to believe me. I didn't do anything. I can't get in trouble."

¶ 27    K.B was interviewed by Paul Reed, a detective with the South Beloit Police Department. Concerning K.B.'s interviews, the following colloquy occurred:

"Q. Did you speak to Detective Reed about this incident on two different occasions?

A. Yes.

Q. Okay. And is it fair to say that in interview number two that you were a little more forthcoming with information?

A. Yes.

Q. Okay. How old were you when this occurred?

A. I was seventeen.

Q. And how did you feel during the first interview?

A. I was nervous, and it was so soon I feel like I was still processing.

Q. Was there anything different between the first interview and the second interview?

A. I would say I felt more comfortable talking about it in the second interview because the first interview I was still in a state of shock.

Q. And between the first and second interviews, were those within a few days of each other?

A. Yes."

¶ 28         On cross-examination, K.B. identified a photograph of an unbroken chain in the possession of the defense that looked like the chain she was wearing on the night of the sexual assault. However, she said the chain she had been wearing was broken. There was no inquiry or explanation given for the use of a photograph. The chain was not introduced at trial.

¶ 29         Defense counsel asked K.B. about her initial interview with Reed, and the following colloquy occurred:

"Q. Do you recall Detective Reed asking you the following question: Okay. And as far as you're—I mean, I'm not talking about what happened with anybody else. But as far as you're concerned, there was no sexual contact with anybody there. Is it—am I correct?

And your response was: With who?

With anybody. With [defendant], with Anthony—with anybody.

Not that I can remember.

A. Yes.

Q. Do you remember that question and you providing that answer?

A. Yes.

Q. And so in that interview you told Detective Reed that you couldn't remember any sexual contact?

A. So I think I was referring to penetration.

Q. Did you tell Detective Reed that?

A. I'm not sure.

Q. If that was what you were—did you ever tell Detective Reed that at any time?

A. Was this in the first interview?

Q. Yeah.

A. I'm not sure.

Q. Did you tell Detective—did you make that clarification at any point with Detective Reed?

A. I'm not sure.

Q. That would have been—fair to say that would have been super important?

A. Yeah.

Q. Would you consider—penis-to-mouth contact, would you consider that sexual contact?

A. It is.

Q. And you told Detective Reed that you couldn't remember.

A. This was the day after.

Q. And it was very fresh in your memory; correct?

A. Yes. But I was also in shock still. I was still trying to process what really happened."

¶ 30    Defense counsel questioned how K.B. "kind of forgot about" the knife incident and went back in the house. K.B. responded, "I was drinking, so I was kind of just going on." The following colloquy also occurred:

"Q. All right. And so you made the decision to come back into the house after you say that [defendant] did something with that knife?

A. Yes.

Q. Why did you do that?

A. I was seventeen, and I—I honestly don't know.

Q. And you had a ride to leave; right?

A. Yes.

Q. And that ride would have taken you anywhere you asked to go; correct?

A. I think it was kind of a control relationship I had with him, and I was

scared.

Q. With who?

A. I felt like I had to stay.

Q. Sorry. With who?

A. With [defendant].

Q. Okay. But with the driver of the car—

A. Kennedy, yes.

Q. You were in the car; right?

A. Yes. I was a passenger.

Q. And so would the driver have taken you anywhere you wanted to go?

A. Yes.

Q. Okay. Would have taken you home?

A. I believe so.

Q. Would have taken you to the police, given the knife thing that had just happened?

A. Yes."

¶ 31       K.B. admitted she was "pretty intoxicated" and that "somewhat" affected her ability to remember things clearly. She did not recall if she blacked out at any point. However, she believed her first drink of the night was at defendant's home. K.B. could not recall why she initially called Kennedy to pick her up but recalled crying on the phone. K.B. said she was emotional because defendant was aggressive and "naturally [had] an aggressive personality." She could not recall if they had been arguing.

¶ 32       On recross-examination, K.B. stated she remembered being assaulted. The State

asked K.B. why she did not tell Reed about the assault in the first interview, and she said, "I think I was scared and I didn't know what to say and I was confused and I was processing it all."

¶ 33    Kennedy testified she was at a friend's birthday party when K.B. called her for a ride. K.B. was crying and sounded scared. When Kennedy arrived, defendant was screaming at K.B. and had a knife in his hand. He told K.B. not to go with Kennedy, got mad, and "punched his neighbor's mailbox and he started going like, insane." Defense counsel did not object to that testimony.

¶ 34    Kennedy testified defendant eventually calmed down and spoke with her, and she decided to stay. She also thought things would be okay because "his mom was out there by the fire and everything." In between arriving to pick up K.B. and later deciding to go inside the house, Kennedy took a group of people, including K.B and K.T., to McDonald's.

¶ 35    Kennedy testified a group of people went to the basement. Everyone except Kennedy was drinking and was drunk. When asked about K.B.'s level of intoxication, Kennedy said, "She held herself well." Kennedy said K.T. was asleep and "was a little more intoxicated."

¶ 36    Kennedy testified she witnessed Anthony sexually assault K.T. while K.T. was sleeping. Kennedy said both she and K.B. said "this was rape," and defendant said, "No. It's fine." On cross-examination, she elaborated, indicating both defendant and Anthony were "making jokes about it." Randy then told Kennedy she should "get out of there" and that he would "take care of it" and "make it stop." Kennedy said she was outside the door and went back to get K.B. She testified K.B. came out with "bruises all over her" and "crying like I've never seen her cry before." Kennedy went back to the basement to look for K.B.'s shoes and saw defendant and Anthony trying to sexually assault K.T. while she was sleeping. Both were undressed. Randy told Kennedy to "get out" and said he would get K.T. out.

¶ 37        Eventually K.T. came out, and both Anthony and defendant came out and started fighting in the road. Kennedy, K.B., and K.T. then left in Kennedy's car. The police were called about five hours later.

¶ 38        Jennifer Jungen, a nurse, testified she performed a sexual assault kit on K.B. Jungen observed bruises on K.B.'s left upper arm, left lower arm, and left leg and three burn marks. K.B. reported the burn marks were old injuries. K.B also reported a hickey on the right side of her neck and said she was held down by her upper arms.

¶ 39        Heather May, a forensic scientist, testified she did not detect male DNA in an oral swab taken from K.B. She stated DNA could be washed away or lost over time. May compared a sample collected from what was described as a "hickey mark" from K.B.'s neck. She testified there were two male DNA profiles present, one minor and one major. Defendant could not be excluded as a contributor to the major profile. When asked to explain what that meant, May testified as follows:

> "When someone cannot be excluded, it's the same thing as saying that they are included. It means that all of the information in that person's known DNA profile is consistent with what was observed in the evidence result. So there was not one piece of information that was inconsistent between my interpretation of the major male profile and [defendant's] known DNA profile."

May also explained:

> "The statistical frequency that I calculated for the association was that approximately one in 240 septillion unrelated individuals could also not be excluded as being a contributor of that result. And those numbers are telling us how common or rare that evidence profile is. A higher number would be more

rare and a lower number would be more common."

¶ 40       Reed testified he investigated the incident. At her first interview, K.B. said she did not know for sure what had happened. Reed believed she remembered more than she told him and suspected she was afraid to tell him what happened.

¶ 41       Defendant elected not to testify at trial.

¶ 42                    1. *Jury Instructions*

¶ 43       During the jury instruction conference, the State offered a modified version of IPI 11.55. The unmodified version of IPI Criminal 4th No. 11.55 provides:

> "A person commits the offense of criminal sexual assault when he
>
> [1] commits an act of sexual penetration upon the victim by the use of force or threat of force.
>
> [or]
>
> [2] commits an act of sexual penetration upon the victim knowing that the victim was unable to [ (understand the nature of the act) (give knowing consent to the act) ].
>
> [or]
>
> [3] is a [ (family member) (person responsible for the child's welfare) ] and commits an act of sexual penetration with the victim who was under 18 years of age when the act is committed.
>
> [or]
>
> [4] commits an act of sexual penetration with the victim who was at least 13 years of age but under 18 years of age when the act is committed, and he is 17 years of age or older and holds a position of trust, authority, or supervision in

relation to the victim."

¶ 44 The modified version offered by the State consisted of two separate sentences defining criminal sexual assault. One sentence defined it as an act of penetration by threat of force. The second sentence defined it as an act of penetration committed upon the victim knowing the victim was unable to give knowing consent to the act.

¶ 45 The following colloquy occurred:

"THE COURT: This has been modified to reflect the two different ways [defendant] is charged with criminal sexual assault.

[DEFENSE COUNSEL]: So if I may just have a moment, Judge?

THE COURT: Yes.

(Brief interruption.)

[DEFENSE COUNSEL]: Yeah. I think 'threat of force' should be stricken because the only manner—the only count that use of force even applies to is Count One of Three and the only manner in which the indictment to wit [*sic*] clause could be interpreted is by the use of force and not by the threat of force.

THE COURT: So as in you have no issue with the two separate paragraphs with the two separate ways but would modify the first one only to say 'use of force.'

[DEFENSE COUNSEL]: Exactly.

[STATE'S ATTORNEY]: That's fine. The bill of indictment just says 'use of force.' "

¶ 46 The instruction ultimately given provided:

"A person commits the offense of criminal sexual assault when he

commits an act of sexual penetration upon the victim by the use of force.

A person also commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim knowing that the victim was unable to give knowing consent to the act."

¶ 47    The State told the trial court it would have an instruction on the definition of "sexual penetration" but had left it out. Defense counsel stated, "I believe we can agree on that quickly tonight and, if there's an issue, address it first thing in the morning. There's not gonna be any objection to the instruction."

¶ 48    The next day, the State offered instruction No. 26, which was a modified instruction based on IPI Criminal 4th No. 11.65E. The unmodified version provides:

"The term 'sexual penetration' means any

[1] contact, however slight, between the sex organ or anus of one person and [(an object) (the [(sex organ) (mouth) (anus)] of another person)].

[or]

[2] intrusion, however slight, of any part of [(the body of one person) (any animal) (any object)] into the [(sex organ) (anus)] of another person [, including but not limited to [(cunnilingus) (fellatio) (anal penetration)]]. [Evidence of emission of semen is not required to prove sexual penetration.]"

¶ 49    The following colloquy occurred:

"THE COURT: People's 26, which is the definition of—two definitions of 'sexual penetration.'

[DEFENSE COUNSEL]: No objection.

THE COURT: That will be given.

- 16 -

[STATE'S ATTORNEY]: Sorry. People's 26 should show it's modified, I guess. And it's not really modified. It's just both the definitions together.

THE COURT: This was modified to the extent it says 'also'?

[DEFENSE COUNSEL]: And I'm sorry, Judge. My apologies. In 26 the 'or anus' should be stricken because there's no allegation.

THE COURT: [State's attorney.]

[STATE'S ATTORNEY]: I don't understand what he thinks there's no allegation of. There's penetration sex organ to mouth and penetration alleged.

THE COURT: The first definition says 'between the sex organ or anus.[']

[STATE'S ATTORENY]: Oh. That's fine. I'll take 'anus' out.

THE COURT: That will be 26(a)."

¶ 50    The jury was instructed regarding sexual penetration as follows:

"The term 'sexual penetration' means any contact, however slight, between the sex organ of one person and the mouth of another person.

The term 'sexual penetration' also means any intrusion, however slight, of any part of the body of one person into the sex organ of another person."

¶ 51              2. *Conviction, Sentencing, and Posttrial Motions*

¶ 52    The jury found defendant guilty of criminal sexual assault against K.B. on counts I and III. The jury found him not guilty of criminal sexual assault against K.T. in count II.

¶ 53    On May 16, 2024, defendant filed a motion for a new trial, alleging the trial court erroneously admitted evidence of the knife incident, arguing it was irrelevant to the charges concerning the events in the basement of the home. Defendant also characterized the incident as prejudicial, but he did not specifically argue it was more prejudicial than probative. Defendant

also alleged the evidence was insufficient to prove him guilty beyond a reasonable doubt.

¶ 54        At the hearing on the motion, defense counsel argued the knife incident was too far removed from the facts of the sexual assault to be admissible. Counsel did not argue the evidence was more prejudicial than probative. The trial court denied the motion, noting the knife incident put into context what defendant was capable of and K.B.'s perception of force.

¶ 55        On July 18, 2024, the trial court sentenced defendant to four years and six months' imprisonment. Defendant was given 152 days of sentencing credit for time spent in jail. However, the court denied credit for time spent on bail subject to a 12-hour curfew. On August 7, 2024, defendant filed a motion to reconsider the sentence, seeking credit for time spent under "home detention" while awaiting trial under section 5-4.5-100(b) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-4.5-100(b) (West 2024)). The court denied the motion.

¶ 56        This appeal followed.

¶ 57                          II. ANALYSIS

¶ 58        On appeal, defendant contends (1) the trial court erred in allowing evidence defendant threatened K.B. and another person with a knife, (2) the court plainly erred by removing bracketed language from the jury instructions or counsel rendered ineffective assistance by agreeing to the instructions, (3) the evidence was insufficient to convict defendant beyond a reasonable doubt, and (4) defendant was entitled to sentencing credit for time spent on bail subject to a 12-hour curfew.

¶ 59                    A. Evidence of Use of a Knife

¶ 60        Defendant contends the trial court erred in allowing other crimes evidence that he threatened K.B and Kennedy with a knife. He argues the evidence was both inadmissible and

more prejudicial than probative. The State argues the evidence was admissible as part of a continuing narrative of the events giving rise to the offense and was additionally relevant to defendant's use of force.

¶ 61 "Evidence is relevant if it has any tendency to make the existence of any fact consequential to the determination of an action either more or less probable than it would be without the evidence." *People v. Watts*, 2022 IL App (4th) 210590, ¶ 63 (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)).

"Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides evidence of other crimes, wrongs, or acts may be admissible for purposes other than to show propensity, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evidence may also be permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge." *Id.*

¶ 62 "Evidence of other crimes or bad acts may also be admissible when part of a continuing narrative of the events giving rise to the offense, intertwined with the charged offense, or it explains an aspect of the charge that would otherwise be implausible or inexplicable." *Id.* ¶ 64. "Thus, events forming a continuing narrative, even if they reflect negatively on the defendant, may be permitted when the events are 'linked and it would be illogical for the trial court to uncouple them and give the jury only half the story.' " *Id.* (quoting *People v. Pikes*, 2013 IL 115171, ¶ 24). They are admissible because "[s]uch uncharged crimes do not constitute separate, distinct, and disconnected crimes." *Pikes*, 2013 IL 115171, ¶ 20. However, evidence of other crimes may not be admitted under the continuing-narrative

exception, even when the crimes occur in close proximity, when the crimes are distinct and undertaken for different reasons, at a different place, and at a separate time. *Watts*, 2022 ILL App (4th) 210590, ¶ 64.

¶ 63    "The admissibility of other-crimes evidence rests within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of discretion." *Id.* ¶ 65. A trial court abuses its discretion only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Young*, 381 Ill. App. 3d 595, 600 (2008).

¶ 64    Here, the testimony concerning defendant's threats using a knife was not introduced as evidence of other crimes to show propensity to commit criminal acts. Instead, the trial court found the knife incident was part of a larger, several-hour incident and admitted the evidence to show a continuing narrative of the facts of the case. Defendant, however, argues the incident was not sufficiently intertwined with the sexual assault to be part of a continuing narrative. He maintains the knife incident was a distinct, separate, and unconnected event that was undertaken for a different reason, at a different place, and at a separate time. We disagree.

¶ 65    The incident with the knife occurred at the same party and within a few hours of the sexual assault. The incident was further presented as one in which defendant used the knife to coerce and prevent K.B. from leaving. Such coercive behavior toward K.B. was part of an ongoing narrative of defendant's later forceful and coercive behavior during the sexual assault. It also helped explain K.B.'s reaction to the events of the evening, as she stated she came back to the house or stayed there because of a "control relationship" she had with defendant and because she was scared about what he might do if she was not there. Thus, the threat with a knife earlier in the evening added context to the events of the evening. As such, it also assisted in making

otherwise inexplicable behavior more explainable. Suppressing the evidence would have left the jury with an incomplete story of the events of the evening.

¶ 66        Defendant also relies in part on *People v. Jacobs*, 2016 IL App (1st) 133881, to argue the continuing-narrative rule does not apply. There, the defendant was convicted of possession of a stolen vehicle. *Id.* ¶ 1. During the trial, testimony was allowed from the son of the owner of the stolen vehicle that his parents' home was burglarized and the burglar stole his father's car and his mother's jewelry. *Id.* ¶ 17. The son then testified that, while searching local pawn shops for his mother's jewelry, he saw the defendant come out of a pawn shop and enter the stolen car. *Id.* ¶ 21. The appellate court found allowing the testimony was error. *Id.* ¶¶ 69-71. However, the court did not explicitly find the continuing-narrative rule did not apply. Instead, the court found, even if it accepted the evidence at issue was part of a continuing narrative, it questioned the probative value of the evidence and further found the prejudicial impact of the evidence outweighed its probative value. *Id.* ¶¶ 69-70. In particular, the court noted the defendant, while linked to possession of the stolen vehicle, was not linked to or charged with the burglary at the home. *Id.* ¶ 70. In contrast, here, defendant's presence at the party is uncontested, and his behavior there gave context to the sexual assault a while later. Accordingly, we find *Jacobs* does not provide support for defendant's argument.

¶ 67        Defendant also argues the evidence was more prejudicial than probative. However, defendant did not raise that argument in the trial court or in a posttrial motion. Defendant was clear throughout trial that his objection was based on relevance because the knife incident was unrelated to the "use of force" language contained in the indictment. In order to preserve an issue for review, a defendant must both offer a specific objection at trial and raise the matter in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Mendoza*,

354 Ill. App. 3d 621, 627 (2004). In his briefs, defendant does not acknowledge his forfeiture of the issue and does not ask us to review the matter for plain error. Accordingly, any argument concerning plain error has also been forfeited. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) (finding the failure to argue the evidence was closely balanced or the error was so severe that it must be remedied to preserve the integrity of the judicial process forfeited plain error on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1 2020).

¶ 68    In sum, the trial court's decision to allow the evidence was not arbitrary, fanciful, or unreasonable. Accordingly, the court did not abuse its discretion.

¶ 69                                    B. Jury Instructions

¶ 70    Defendant next contends the trial court erred in instructing the jury by omitting the term "or" where appropriate from IPI Criminal 4th Nos. 11.55 and 11.65E. Defendant acknowledges the failure of defense counsel to raise the issue in the trial court but argues we should review the matter for plain error or that ineffective of assistance of counsel applies. The State responds plain-error review of defendant's claim is not warranted because defendant affirmatively acquiesced to the instructions. As to ineffective assistance of counsel, the State argues defendant cannot show deficient representation or prejudice.

¶ 71    The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence so the jury may reach a correct conclusion according to the law and the evidence. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). Whether the trial court erred in refusing a jury instruction is reviewed for an abuse of discretion. *People v. Nere*, 2018 IL 122566, ¶ 29. Whether the jury instruction accurately conveyed the law applicable to the case is reviewed *de novo*. *Id.*

¶ 72    Under the invited-error doctrine, a party cannot complain of error it brought about

or participated in. *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001). Our supreme court "has recognized that 'a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion.' " *People v. Patrick*, 233 Ill. 2d 62, 76 (2009) (quoting *People v. Herron*, 215 Ill. 2d 167, 175 (2005)). The forfeiture principle encourages the defendant to raise issues before the trial court, allowing the court to correct its own errors before the instructions are given, and thus disallowing the defendant to obtain a reversal through inaction. *Herron*, 215 Ill. 2d at 175.

¶ 73 Moreover, when a defendant procures or invites an error, the defendant may not raise on appeal the error that he or she invited in the trial court, as plain error or otherwise. *People v. Harvey*, 211 Ill. 2d 368, 386 (2004). Thus, when defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's only challenge that may be presented is a claim for ineffective assistance of counsel. *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011).

¶ 74 Here, defendant suggested modifications to the instructions but never objected to the omission of the words "or" where applicable or to the shortening of the instructions. Instead, defendant explicitly agreed with the instructions. Regarding IPI Criminal 4th No. 11.55, the trial court specifically asked defense counsel if he had an issue with the use of two separate paragraphs to describe the elements, and counsel stated his agreement. Regarding IPI Criminal 4th No. 11.65E, counsel specifically told the court the day before it was offered there would be no objection to the instruction. Then, the next day, counsel sought a different modification to the instruction and otherwise agreed the instruction was proper. By actively participating in the wording of the instructions without complaining about the omission of the words "or" in places

and specifically agreeing to the instructions as given, defense counsel affirmatively acquiesced to the court's instructions and, under the invited-error doctrine, defendant cannot object to the instructions on appeal, nor can he seek plain-error review.

¶ 75 However, as noted, defendant also contends his counsel rendered ineffective assistance by agreeing to the instructions. Defendant has not forfeited that claim.

¶ 76 Claims of ineffective assistance of counsel are evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.* at 687-88. Under the first prong, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Under the second prong, a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

¶ 77 Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. *People v. Jackson*, 2020 IL 124112, ¶ 90. Thus, courts may resolve ineffectiveness claims under the two-part *Strickland* test by reaching only the prejudice component, because lack of prejudice renders irrelevant the issue of counsel's performance. See *People v. Erickson*, 161 Ill. 2d 82, 90 (1994); *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). We determine defendant cannot show prejudice from the alleged deficiencies in the instructions.

¶ 78 Here, the unmodified version of IPI Criminal 4th No. 11.55 provides:

"A person commits the offense of criminal sexual assault when he

- 24 -

[1] commits an act of sexual penetration upon the victim by the use of force or threat of force.

[or]

[2] commits an act of sexual penetration upon the victim knowing that the victim was unable to [ (understand the nature of the act) (give knowing consent to the act) ].

[or]

[3] is a [ (family member) (person responsible for the child's welfare) ] and commits an act of sexual penetration with the victim who was under 18 years of age when the act is committed.

[or]

[4] commits an act of sexual penetration with the victim who was at least 13 years of age but under 18 years of age when the act is committed, and he is 17 years of age or older and holds a position of trust, authority, or supervision in relation to the victim."

¶ 79    The instruction ultimately given provided:

"A person commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim by the use of force.

A person also commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim knowing that the victim was unable to give knowing consent to the act."

¶ 80    The unmodified version of IPI Criminal 4th No. 11.65E provides:

"The term 'sexual penetration' means any

- 25 -

[1] contact, however slight, between the sex organ or anus of one person and [(an object) (the [(sex organ) (mouth) (anus)] of another person)].

[or]

[2] intrusion, however slight, of any part of [(the body of one person) (any animal) (any object)] into the [(sex organ) (anus)] of another person [, including but not limited to [(cunnilingus) (fellatio) (anal penetration)]]. [Evidence of emission of semen is not required to prove sexual penetration.]"

¶ 81    The jury was instructed regarding sexual penetration as follows:

"The term 'sexual penetration' means any contact, however slight, between the sex organ of one person and the mouth of another person.

The term 'sexual penetration' also means any intrusion, however slight, of any part of the body of one person into the sex organ of another person."

¶ 82    Defendant contends the instructions were in error because of the omission of the bracketed word "or" from the instructions. Defendant argues this required the jury to assume they had to find all of the propositions occurred rather than recognize there were multiple alternate grounds for conviction.

¶ 83    We first note, while the instructions did not use the word "or," they did use the word "also," which generally conveyed the same meaning to the jury. Thus, we disagree with defendant's argument that the instructions failed to separate between distinctive grounds for conviction. In any event, even if we were to accept defendant's argument that the instructions failed to do so, defendant cannot show prejudice.

¶ 84    Defendant's complaint is the instructions required the jury to find multiple grounds for conviction instead of just one of the proposed options. In effect, he contends the

instruction increased the State's burden. Such an interpretation favored defendant because, if interpreted in that manner, the jury would have found both grounds for criminal sexual assault and both forms of penetration when it was required to find only one. As such, it is impossible under defendant's argument for any defect in the instructions to show the result of the proceeding would have been different since, under defendant's interpretation of the instructions, he still would have been found guilty. This was the opposite of prejudice; it was an advantage or benefit to defendant. Accordingly, defendant has failed to show prejudice even if counsel's representation was deficient.

¶ 85                                    C. Sufficiency of the Evidence

¶ 86            Defendant contends the State failed to prove him guilty beyond a reasonable doubt. He argues K.B.'s testimony was "incredibly flawed," uncorroborated, and contained significant inconsistencies such that he could not be found guilty beyond a reasonable doubt.

¶ 87            A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 88            The determination of the credibility of each witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the evidence is within the province of the

trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on those matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). "Moreover, the testimony of a single witness, if positive and credible, is sufficient to prove a defendant guilty beyond a reasonable doubt." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 62. Further, minor inconsistencies in the testimony do not, of themselves, create a reasonable doubt as to a defendant's conviction. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993).

¶ 89　　　　Evidence a witness was drinking near the time of an event about which she testifies is probative of the witness's sensory capacity and affects the weight to be given to the witness's testimony. *People v. Gray*, 2017 IL 120958, ¶ 40. "However, the fact that a witness had been drinking alcohol or was drunk does not necessarily preclude the trier of fact from finding the witness credible." *Id.*

¶ 90　　　　Here, while K.B.'s testimony was less than ideal, it nevertheless was sufficient for the jury to find defendant guilty beyond a reasonable doubt. While defendant points to various inconstancies or "flaws" in the evidence, the jury heard these same "flaws," and the jury was able to view K.B., hear her testimony, and was in the best position to determine her credibility. In many cases, K.B. explained her actions or the record contained reasonable explanations for what defendant characterizes as inconsistencies in the testimony. For example, defendant noted K.B. did not tell Reed about the sexual assault at the first interview. However, K.B. acknowledged she did not do so and testified she was still processing what had happened. She also indicated she believed Reed was asking her about vaginal penetration during the first interview. Further, although K.B. did not tell Reed of the sexual assault at the first interview, the police were called, and she had been to the hospital, where a sexual assault kit was performed, including an oral swab. It is reasonable to believe K.B. did that because she believed a sexual

assault occurred.

¶ 91     Defendant also suggests the record contradicts K.B.'s claim defendant tore a necklace from her neck because Jungen or K.B. referred to the bruise on her neck as a hickey. However, K.B. testified defendant broke the necklace but never stated the bruise on her neck was caused by the necklace. She repeated her assertion that defendant tore a necklace from her neck when shown an intact necklace she said was similar to the one she wore. We note again how the necklace was obviously in the possession of the defense, since they produced the photograph, but chose not to produce the actual necklace at trial.

¶ 92     Defendant further notes inconsistencies concerning K.B.'s and Kennedy's accounts of defendant's threats using the knife. However, the testimony was generally consistent in that defendant had a knife and, where Kennedy did not provide details matching those provided by K.B., we note Kennedy was also never asked about such details. Defendant also argues it was improbable that K.B. would return to defendant's home after the knife incident, but K.B. suggested she did so in part because of a "control relationship" she had with defendant and she was scared of what would happen if she did not return. The evidence as a whole also suggested she was familiar with defendant's aggressive nature. Whatever concern K.B. had was lessened when defendant eventually calmed down after the knife incident and spoke with her, and she decided to stay.

¶ 93     Further, we disagree that K.B.'s testimony was uncorroborated. DNA evidence showed defendant had been in physical contact with the area of K.B.'s neck, and Kennedy provided testimony about K.B.'s emotional state and other incidents in the basement of the home, providing circumstantial evidence supporting K.B.'s testimony. Finally, while K.B. testified her intoxication affected her memory, she also was able to testify about the events of the

evening, and Kennedy testified K.B. was not as intoxicated as K.T. The effect of K.B.'s

intoxication on her credibility was a matter for the jury to determine. We will not second guess

that determination. Accordingly, the evidence was sufficient to convict defendant beyond a

reasonable doubt.

¶ 94        D. Sentencing Credit for Time Spent on Bail Subject to a Curfew

¶ 95        Finally, defendant argues he is entitled to sentencing credit for time spent on bail

subject to a 12-hour curfew, which he characterizes as "home detention" under section

5-4.5-100(b) of the Code of Corrections (730 ILCS 5/5-4.5-100(b) (West 2024)). The State

contends section 5-4.5-100(b) is not applicable, and instead, the trial court ordered defendant to

be placed on pretrial "home supervision" under section 110-10(b)(5) of the Code of Criminal

Procedure of 1963 (Procedure Code) (725 ILCS 5/110-10(b)(5) (West 2024)), which would not

entitle defendant to sentencing credit.

¶ 96        Section 5-4.5-100(b) of the Code of Corrections addresses credit for time spent in

custody and provides:

> "[T]he offender shall be given credit on the determinate sentence *** for the
> number of days spent in custody as a result of the offense for which the sentence
> was imposed. *** The trial court shall give credit to the defendant for time spent
> in home detention on the same sentencing terms as incarceration as provided in
> Section 5-8A-3 (730 ILCS 5/5-8A-3). Home detention for the purposes of credit
> includes restrictions on liberty such as curfews restricting movement for 12 hours
> or more per day and electronic monitoring that restricts travel or movement." 730
> ILCS 5/5-4.5-100(b) (West 2024).

¶ 97        The Code of Corrections further defines "home detention" in Article 8A of

Chapter V under the Electronic Monitoring and Home Detention Law, which contains provisions addressing when and how electronic monitoring and home detention may occur. *Id.* § 5-8A-2(c). "Home detention" is defined as

> "the confinement of a person convicted or charged with an offense to his or her place of residence under the terms and conditions established by the supervising authority. Confinement need not be 24 hours per day to qualify as home detention, and significant restrictions on liberty such as 7pm to 7am curfews shall qualify. Home confinement may or may not be accompanied by electronic monitoring, and electronic monitoring is not required for purposes of sentencing credit." *Id.*

¶ 98    The Code of Corrections defines "supervising authority" as

> "the Department of Corrections, the Department of Juvenile Justice, probation department, a Chief Judge's office, pretrial services division or department, sheriff, superintendent of municipal house of corrections or any other officer or agency charged with authorizing and supervising electronic monitoring and home detention." *Id.* § 5-8A-2(E).

Notably, an individual trial court judge is not included in the definition of a "supervising authority" under the Code of Corrections.

¶ 99    Meanwhile, the Procedure Code governs the conditions of pretrial release for criminal defendants. The Procedure Code provides the trial court may impose conditions when releasing a defendant pretrial, including for the defendant to "[b]e placed under direct supervision of the Pretrial Services Agency, Probation Department or Court Services Department in a pretrial home supervision capacity with or without the use of an approved electronic

- 31 -

monitoring device subject to Article 8A of Chapter V of the Code of Corrections." 725 ILCS 5/110-10(b)(5) (West 2024). The Procedure Code also allows for additional conditions of release, including reasonable conditions as the court may impose. *Id.* § 110-10(b)(9).

¶ 100　　　　In *People v. Donahue*, 2022 IL App (5th) 200274, and *People v. Currey*, 2024 IL App (2d) 230099, Illinois appellate courts considered whether a defendant subject to pretrial bond "home supervision" was eligible for presentence custody credit. In each case, the court determined the Procedure Code was applicable and the defendant was not entitled to sentence credit because the trial court was the entity that set the conditions for the defendant's release and was not included in the definition of a "supervising authority" under the Code of Corrections.

¶ 101　　　　In *Donahue*, 2022 IL App (5th) 200274, ¶ 11, the defendant was released on bail bond with restrictions, including that he remain in his residence except for work or other approved reasons with electronic home monitoring. On appeal, the defendant argued he was eligible for sentencing credit for time spent in "home detention." *Id.* ¶ 6. The Appellate Court, Fifth District, examined the statutes and found "home supervision" under the Procedure Code was distinct from "home detention" under the Code of Corrections. *Id.* ¶ 23. In particular, the Fifth District determined the definition of "home detention" in the Code of Corrections required the defendant be confined " 'under the terms and conditions established by the supervising authority.' " *Id.* ¶ 29 (quoting 730 ILCS 5/5-8A-2(C) (West 2020)). However, the term "home supervision" in the Procedure Code was not defined. *Id.* ¶ 12. Thus, the court gave it its plain and ordinary meaning. *Id.* (citing *People v. McChriston*, 2014 IL 115310, ¶ 15). The court then held "supervision" was "defined as 'the act, process, or occupation of supervising: direction, inspection, and critical evaluation.' " *Id.* (quoting Webster's Third New International Dictionary 2296 (1976)). Thus, the court held, "the plain and ordinary meaning of home supervision is the

inspecting, directing, and evaluating defendant's compliance with the terms of his bond conditions." *Id.*

¶ 102    Noting previous precedent that time spent in home confinement on bond was not time spent in "custody," the *Donahue* court ultimately found the trial court, which set the conditions for the defendant's release, was not included in the definition of "supervising authority" as contemplated by the Code of Corrections. *Id.* ¶ 32. The court recognized the fact the Procedure Code expressly referenced the electronic monitoring and home detention provisions of the Electronic Monitoring and Home Detention Law located in the Code of Corrections but held that did not suffice to confer equivalency between "home supervision" in the Code of Procedure and "home detention" in the Code of Corrections. *Id.* ¶ 23. The court noted the term "home supervision" did not appear in the Electronic Monitoring and Home Detention Law. *Id.* Instead, the Electronic Monitoring and Home Detention Law used and defined the term "home detention." *Id.* The court held usage of two separate terms in those related statutes suggested that the legislature did not intend them to be synonymous. *Id.* Rather, it evinced an intent that they mean different things. *Id.* (citing *RVS Industries, Inc. v. Village of Shiloh*, 353 Ill. App. 3d 672, 676 (2004) (the expression of one thing implies the exclusion of another).

¶ 103    The *Donahue* court then held the following:

> "In other words, the use of 'home supervision' in the bail provisions means that the legislature did not intend that any time an offender was released on bond with a condition that he remain at his residence (or residence and workplace), he would automatically be deemed to have been placed in a home detention program, thereby making him eligible for sentencing credit. Instead, if

he were placed in a home detention program, the trial court would have to expressly state that the offender was being confined in a home detention program, and the requirements of that program would have to be followed for the offender to later qualify for sentencing credit. In short, considering our foregoing examinations and analysis, we hold that the legislature consciously and thoughtfully intended 'home supervision,' pursuant to the bail provisions of the [Procedure Code], and 'home detention,' pursuant to the Code of Corrections, to mean separate and distinct things." *Id.* ¶ 24.

¶ 104　　Therefore, the *Donahue* court held, because the defendant was under "home supervision" and not under "home detention" as established by a supervising authority, the defendant was ineligible for sentencing credit. *Id.* ¶ 25. The court further rejected arguments that 2012 amendments to the Code of Corrections defining curfews of longer than 12 hours as "home detention" required a different result because, as the court had already determined, defendant was on "home supervision" under the Procedure Code, which was distinct from the "home detention" provisions of the Code of Corrections. *Id.* ¶ 28.

¶ 105　　In *Currey*, 2024 IL App (2d) 230099, ¶ 21, the Appellate Court, Second District, similarly determined the defendant, who spent time pretrial confined to his parent's home on electronic monitoring, had "commingled and conflated" the terms "home detention" under section 5-4.5-100(b) of the Code of Corrections and "home supervision" under the pretrial release provisions of the Procedure Code. Agreeing with the Fifth District's decision in *Donahue*, the Second District found the defendant did not meet the definition of "home detention" when he was released on bail bond with restrictions. *Id.* ¶ 23. The court noted this determination was "consistent with prior decisions holding that pretrial conditions never

automatically qualify as 'custody' or 'confinement' for home detention sentence credit." *Id.*

¶ 106 The *Currey* court also agreed with the *Donahue* court that the 2012 amendments to the Code of Corrections defining curfews of over 12 hours as "home detention" were not applicable. *Id.* In doing so, the court stated, the amendments notwithstanding, "the throughline remains the same." *Id.* The *Currey* court stated trial courts issuing pretrial release orders are not a "supervising authority" under the Code of Corrections and, thus, the defendant was not on "home detention" because it was the trial court that established the terms and conditions of the defendant's bond, and not another entity, such as the probation department or the Illinois Department of Corrections. *Id.* (citing *Donahue*, 2022 IL App (5th) 200274, ¶ 32).

¶ 107 We find *Donahue* and *Currey* persuasive and applicable to defendant's case. Indeed, while defendant presents the same arguments that were rejected in *Donahue* and *Currey*, he also recognizes their holdings and does not argue those cases were wrongly decided or ask this court to reject their reasoning. Instead, defendant attempts to distinguish *Donahue* and *Currey* by arguing (1) his situation involved more extensive restrictions beyond pretrial confinement and electronic monitoring and (2) the probation office modified his curfew conditions without input from the trial court, showing it was the "supervising authority" acting under the Code of Corrections rather than the court acting under the Procedure Code. We disagree.

¶ 108 First, as illustrated by the reasoning of both *Donahue* and *Currey*, the number or severity of restrictions is irrelevant to the determination as to whether a defendant was on "home supervision" as ordered by the trial court as a condition of release under the Procedure Code, as opposed to "home detention" under the Code of Corrections. As the *Donahue* and *Currey* courts held, the fact that a curfew of over 12 hours in the Code of Corrections is deemed "home

detention" when the Code of Corrections is applicable does not convert a "home supervision" under the Procedure Code to a "home detention." Instead, the Procedure Code remains the relevant provision. Nothing in the statutes provides that such a curfew converts a "home supervision" under the Procedure Code into a "home detention" under the Code of Corrections. Likewise, nothing in the statutes provides that, at a certain level of additional restrictions, "home supervision" ordered by the court under the Procedure Code converts a defendant's status to "home detention" under the Code of Corrections.

¶ 109    As to defendant's argument that he was actually in "home detention" because the pretrial services office was the "supervisory authority" instead of the trial court, the record plainly shows otherwise. The conditions of release were set forth in an order from the trial court specifically referring to defendant's bond. When the pretrial services officer allowed defendant to check in by cell phone, the court specifically told the officer she did not have the authority to modify the conditions of defendant's release. The officer stated her understanding of that, and defendant specifically stated his understanding of that as well in a motion to reconsider. The court then specifically exercised its authority to remand defendant to custody based on his failure to comply with the court's conditions of release. Thus, the record clearly establishes defendant's "home supervision," including his curfew and other conditions of release, was imposed by the court under the Procedure Code and he was not on "home detention" under the Code of Corrections. Accordingly, the trial court properly determined defendant was not entitled to sentencing credit for time spent in pretrial home confinement.

¶ 110                              III. CONCLUSION

¶ 111    For the reasons stated, we affirm the trial court's judgment.

¶ 112    Affirmed.